**Lemuel Ray HAMMERS, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 385S100.**

Supreme Court of Indiana.

Jan. 29, 1987.

J. William Bruner, Boonville, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

This is a direct appeal from conviction by a jury of one (1) count of conspiracy to commit murder, I.C. § 35–41–5–2, a class A felony, and one (1) count of habitual offender, I.C. § 35–50–2–8. Appellant was sentenced to thirty-five (35) years on the conspiracy charge and the sentence was enhanced by five (5) years as a result of the habitual offender determination.

There are seven (7) issues presented on appeal: (1) whether the evidence was sufficient to support a conviction for conspiracy to commit murder; (2) whether due to the acquittal of appellant in the same trial on a charge of inducement to commit murder, the conviction for conspiracy to commit murder violated appellant's constitutional guarantee against double jeopardy; (3) whether the admission of a sworn statement taken at a bail hearing violated appellant's right to confront and cross examine

witnesses against him; (4) whether the testimony of the state's chief witness in the trial of another charged with this murder constituted newly discovered evidence sufficient to require a new trial; (5) whether the trial court erred in admitting certain photographs into evidence; (6) whether the seating of a death qualified jury for the guilt-innocence phase of the trial violated appellant's constitutional right to a representative jury; and (7) whether the enhancement of appellant's sentence by five (5) years due to the habitual offender finding constitutes cruel and unusual punishment.

These are the facts from the record which tend to support the determination of guilt. Junior Staats had worked for appellant, Hammers, at an auto repair and salvage business. Staats quit his job approximately one (1) week prior to his death. He owed appellant $250.00 and owed $300.00 to William McGuinn and Lyle Hare. For some time appellant had told McGuinn and Hare that Staats was a pain in the back and he wished he was dead. The conversations became more serious and approximately two (2) weeks prior to Staats' death, appellant told McGuinn and Hare that if Staats died he'd take them to Tennessee and get them some motorcycles. The day of Staats murder, March 14, appellant reiterated this discussion and mentioned that Staats had some money and everyone should get paid. McGuinn and Hare agreed with appellant to kill Staats. McGuinn and Hare went to the Staats residence and Staats got in their car. They later stopped at the side of a road and Hare shot Staats in the head and left the body in a ditch. They then returned to appellant's business and informed him of Staats death. Appellant went to McGuinn's apartment later that night and told him to come by in the morning to get rid of the evidence. The next morning McGuinn and Hare went to appellant's and discussed changing the barrel of Hare's gun and the tires on McGuinn's car. The two then bought a new barrel for the gun and changed it and the tires. Appellant cut up the old barrel and McGuinn and Hare went to the back of

appellant's business and fired the gun with the new barrel. McGuinn, pursuant to a plea agreement, testified against appellant concerning the murder and the fact that he, Hare, and Staats, often sold stolen cars to appellant.

## I

Appellant contends there was insufficient evidence to support a conviction of conspiracy to commit murder and specifically that the state failed to prove appellant entered into an agreement with McGuinn and Hare to murder Staats, an agreement being a necessary element of the charge of conspiracy.

The conspiracy statute, I.C. § 35–41–5–2, reads in part:

"A person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony. A conspiracy to commit a felony is a felony of the same class as the underlying felony. However, a conspiracy to commit murder is a Class A felony."

The evidence connecting appellant to Staat's death was provided through the testimony of William McGuinn. McGuinn negotiated a plea agreement wherein he would plead guilty to conspiracy to commit murder and testify in any case relative to the death of Junior Staats, in exchange for a recommendation for an executed sentence of twenty (20) years and the state's promise to forego pursuing the death penalty against his brother, Lyle Hare. It is well settled in Indiana that the testimony of an accomplice alone is sufficient to support a conviction.

"A conviction may be based upon the uncorroborated testimony of an accomplice. The fact that an accomplice is induced to testify by a benefit offered to him goes to the weight of the testimony only." *Whitehead v. State* (1986), Ind., 500 N.E.2d 149, *citing Coleman v. State* (1975), 264 Ind. 64, 339 N.E.2d 51. "Only when this Court has confronted "inherently improbable" testimony, *Penn v.*

*State* (1957), 237 Ind. 374, 146 N.E.2d 240, or coerced, equivocal, wholly uncorroborated testimony of "incredible dubiosity," *Gaddis v. State* (1969), 253 Ind. 73, 251 N.E.2d 658, have we impinged on a jury's responsibility to judge the credibility of witnesses." *Rodgers v. State* (1981), Ind., 422 N.E.2d 1211.

■ This Court will only determine the sufficiency, not reweigh the evidence. William McGuinn testified as to the existence of an agreement between appellant, Hare and himself to kill Junior Staats and McGuinn and Hare did in fact kill him. While his testimony was vague in certain respects regarding details of the agreement, as a whole it contained information sufficient to support the conviction of conspiracy to commit murder. As Justice Pivarnik stated in *Williams v. State* (1980), Ind., 274 Ind. 94, 409 N.E.2d 571:

"[T]his Court has explained conspiracy in various terms. ... [T]here must be an agreement, in the sense of a common purpose and understanding, to commit the intended felony, by joining at its formation or by participating in it after it has been formed. It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense, even though the agreement is not manifest by any formal words ... To prove a conspiracy, the prosecution does not need to show a formal arrangement or the parties' use of specific words ... A conviction may rest on circumstantial evidence alone; while evidence of a mere relationship or association is not sufficient, a conspiracy may be inferred from acts of the parties in pursuance of an apparent criminal purpose they have in common ..." *Id.*, 409 N.E.2d at 573. [citations omitted]

Testimony from other witnesses for the state provided corroboration for several important facts in the trial testimony of codefendant McGuinn. One such witness was running his hunting dogs in the off-season in the area where the body was found, when he heard two shots. This was between 7:00 and 7:30 p.m. on the evening of March 14, the date of the murder, thus providing a basis for the inference that death occurred at that time. Another, an employee of appellant, while not knowing the exact content of the conversations, did observe separate conversations take place between appellant, McGuinn and Hare, one shortly before the time of the crime and the other at about 8:00 p.m. immediately after. McGuinn's wife testified that appellant came to their apartment at 9:30 p.m. on the same evening and conferred for about fifteen minutes with her husband and Hare. Officer Perkins testified that he overheard McGuinn say the word "gun" in a telephone conversation with appellant the next day, March 15, at which point appellant was resisting suggestions by Perkins that Perkins be permitted to listen into their conversation. Perkins also verified that there was in fact a gun shop at the location in Owensboro which McGuinn identified as the place he had visited to buy a new barrel for the murder weapon. The independent observations support belief in the truth of McGuinn's trial testimony and the inference that the subject matter of all four conversations dealt with the plan to kill Staats.

## II

Appellant contends that the guilty verdict for conspiracy to commit murder was precluded by his acquittal on the "inducement to commit murder" charge, therefore violating his constitutional right against double jeopardy.

First, it must be emphasized that appellant was charged with conspiracy to commit murder and *murder*. I.C. § 35-41-2-4 reads:

"A person who knowingly or intentionally aids, induces, or causes another person to commit an offense *commits that offense* . . . ." [emphasis added]

Aiding, inducing or causing an offense is not a separate offense but is, in fact, the basis of liability for the underlying offense, in this instance, murder.

■ Appellant acknowledges the general rule that acquittal on the substantive charge does not bar conviction for conspiracy to commit the same crime. Still, appellant asserts this case falls under an exception to the general rule that where the necessary proof on the substantive charge is identical with that required for conviction on the conspiracy count, acquittal on the substantive charge precludes conviction on a conspiracy count. *Weekley v. State* (1981), Ind.App., 415 N.E.2d 152, 157. Here, the specific argument is that the identical proof was required to show both the inducement and the agreement, thereby prohibiting conviction for conspiracy when appellant was acquitted of the murder.

There is in point of law no such exception applicable where there is but one trial upon a single indictment or information consisting of separate counts in which separate offenses are alleged. Guilty verdicts resulting from a single trial upon such an indictment or information will stand on appeal if they are supported by sufficient evidence, even though acquittals occurring at the same time and based upon the same evidence appear illogical. *U.S. v. Heavlow* (3rd Cir.1972), 468 F.2d 842. These are regarded as "disparate" verdicts which do not impinge interest protected by the double jeopardy clauses. Successive trials, however, raise additional concerns related to constitutional aspects of the doctrine of *res judicata.*

■ Even if the exception noted in *Weekley v. State, supra,* were applicable here, the elements of the murder and the elements of the conspiracy are not the same. Each requires proof of facts which the other does not and they are not the same offense.

■ To prove that the appellant committed the crime of murder, the State would have to show:

(1) That appellant;

(2) Knowing or intentionally;

(3) Induced;

(4) McGuinn and Hare;

(5) To murder the victim.

To prove that the appellant committed the crime of conspiracy to commit murder, the State would have to show:

(1) That appellant;

(2) Entered into an agreement;

(3) With McGuinn and Hare;

(4) To murder the victim; and

(5) That an overt act in furtherance of that agreement was committed.

Appellant contends these crimes are the same in that the agreement element in the conspiracy count was the agreement to pay two motorcycles in return for the murder of the victim. However, the charging information alleging conspiracy to commit murder does not mention the payment of motorcycles as constituting the agreement. It is reasonable to believe that the jury concluded either that there was no promise of motorcycles for payment or that the promise was not the inducement or cause of the murder. Even disregarding the motorcycle testimony, which the jury was not obligated to do simply because it acquitted appellant of the murder, there was sufficient testimony to support a conviction for conspiracy to commit murder. The proof of an agreement was not limited to the motorcycle testimony, but encompassed several discussions about the benefit of Staats' death to the defendant and others. The lack of payment for the murder does not mean that no agreement existed, only that there was no inducement. The jury was entitled to find that the payment of motorcycles was not the inducement for the murder. This finding does not conflict with the determination that an agreement existed between appellant, Hare and McGuinn to kill Staats. There was no error committed when the jury acquitted appellant of murder and convicted him of conspiracy.

### III

It is asserted that the trial court erred in allowing into evidence the prior sworn testimony of Billy Joe Staats, the brother of the victim. At the time of trial, the state

showed that Billy Joe Staats was not available to testify, that a warrant had been issued for his arrest, that diligent efforts were made to produce him and that family members advised he was in Tennessee but did not know how to contact him. The state was successful in having the sworn testimony of Billy Joe, from appellant's bail hearing, admitted into evidence over appellant's objection. Appellant asserts he did not waive his right to cross-examine Billy Joe by calling him to testify at his bail hearing and therefore the State had to show (1) that the witness was unavailable and (2) that the statement used had sufficient "indicia of reliability", generally meaning that appellant had the opportunity to cross-examine the witness. *Iseton v. State* (1984), Ind.App., 472 N.E.2d 643.

Appellant's argument that he did not waive his right to cross-examine and that the statement contained insufficient indicia of reliability overlap. Appellant bases his position in each on the nature of the bail hearing. He asserts his calling Billy Joe as a witness did not satisfy his right to cross-examine the witness. Appellant argues that to exercise his right to be let to bail, he was forced to call Billy Joe to testify, since he bore the burden of proof at the hearing. He claims his questioning of Billy Joe did not amount to cross-examination, since the nature of the testimony elicited was different than the type of testimony that would be elicited during a standard cross-examination. This contention goes to both the waiver and the right to cross-examine.

Appellant appears to be asserting that he was in some way deprived of the opportunity to fully question Billy Joe. He states:

"that strategy with respect to testimony elicited by Hammers during the bail hearing was to cover those issues which would tend to exonerate Hammers, and let the State, if it chose to, bring out more damaging testimony during cross-examination. Certainly, this was much different than cross-examination during a trial, where the purpose would have been to dispute other parts, or all of the witnesses testimony."

Based upon this statement, appellant urges there was no waiver of his right to cross-examine, activating the two part test enunicated in *Iseton, supra*. Even if we accept the contention that waiver did not occur, which we do not, the *Iseton* test was satisfied. The state sufficiently demonstrated that the witness was unavailable and the second part of the test once again goes to the issue of confrontation.

 At the bail hearing, Billy Joe testified at appellant's request. The testimony was under oath and recorded. Both appellant and his attorney were present and appellant had the opportunity to, and did, question the witness extensively. Two-thirds (⅔) of the transcript read into evidence related questions put forth by appellant. There seems to be no reason to distinguish this case from one in which admission of a deposition is sought. *Gallagher v. State* (1984), Ind.App., 466 N.E.2d 1382. Appellant was given ample opportunity to confront the witness and availed himself of re-direct as well. The trial court did not err by admitting this sworn testimony. Appellant waived his right to confront Billy Joe by calling him at the bail hearing. Furthermore, even if there was no valid waiver, the admission did not violate the confrontation right. Billy Joe was unavailable for trial and the sworn testimony had sufficient indicia of reliability to be properly admitted.

## IV

 The next issue raised is whether the trial court erred in not granting appellant a new trial on the basis of newly discovered evidence. During the trial of Lyle Hare for the murder of Junior Staats, William McGuinn, Hare's Brother, denied all knowledge of the murder and repudiated his prior testimony at appellant's trial and at his own guilty plea. Appellant asserts McGuinn's testimony at this subsequent trial constitutes newly discovered evidence entitling him to a new trial.

The standards to be applied in considering a request for a new trial based on

newly discovered evidence were stated in *Emerson v. State* (1972), 259 Ind. 399, 287 N.E.2d 867, 871–72.

> "An application for a new trial, made on the ground of newly discovered evidence, must be supported by affidavit and such affidavit or affidavits must contain a statement of the facts showing (1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced upon a retrial of the case; and (9) that it will probably produce a different result. *Cansler v. State* (1972), 258 Ind. 450, 281 N.E.2d 881; *Tungate v. State* (1958), 238 Ind. 48, 147 N.E.2d 232. In deciding whether a piece of newly discovered evidence would produce a different result the presiding judge may properly consider the weight which a reasonable trier of fact would give it, and while so doing, may also evaluate its probable impact on a new trial in light of all the facts and circumstances shown at the original trial of the case."

"The granting of a new trial on the ground of newly discovered evidence is within the discretionary ambit of the trial court. This Court will not disturb the ruling unless there is an abuse of the trial court's discretion." *Smith v. State* (1982), Ind., 429 N.E.2d 956, 958.

McGuinn's subsequent testimony does not meet the above standards. Specifically, it is merely impeaching, it is questionable that it is worthy of credit, considering Hare is McGuinn's brother, and it is also unknown if McGuinn would testify the same way at retrial. There was no error in the denial of appellant's request for a new trial based on newly discovered evidence.

## V

█ Appellant also alleges error in the admission of certain aerial photographs of his property and business showing numerous vehicles. He asserts the photographs were irrelevant to the charges and their only purpose was to facilitate the inference that the vehicles were stolen.

Testimony revealed that most conversations concerning the murder occurred on the property and questions were raised as to the possibility of overhearing conversations on the premises. There was testimony that the murder weapon, with its new barrel, was fired repeatedly on part of the property and appellant's ex-wife was questioned about hearing those gun shots.

While appellant contends the photographs were intended to lead the jury to believe the vehicles were stolen, there is nothing in the record to support this. Part of appellant's business was a salvage yard and the presence of numerous vehicles would not be unusual. These photographs were relevant to the evidence and there is no showing of prejudice to appellant.

## VI

█ Appellant further asserts that the seating of a death qualified jury for the guilt-innocence phase of the trial violated his constitutional right to a representative jury under the Sixth and Fourteenth Amendments to the United States Constitution. Appellant, relying on *Grigsby v. Mabrey* (1983), 569 F.Supp. 1273, asserts that death qualified jurors deny him a jury chosen from a fair cross section of the community. Consequently, permitting a death qualified jury to determine guilt or innocence resulted in a violation of appellant's right to a representative jury.

This issue has recently been decided by the United States Supreme Court in *Lockhart v. McCree* (1986), ── U.S. ──, 106 S.Ct. 1758, 90 L.Ed.2d 137, which was consolidated with *Grigsby, supra,* in regards to this issue. The Supreme Court overruled the *Grigsby* decision and held that a determination of guilt or innocence by a death qualified jury does not violate the fair cross-section requirement of the Sixth Amendment.

## VII

█ Finally, Appellant urges that the habitual offender finding in this case constitutes cruel and unusual punishment. He urges imposing five additional years was unjust because the prior felonies, with one exception, were theft related and more than 25 years old.

█ The fact that with one exception the prior felony convictions were for theft does not change their status in relation to the habitual offender count. Regardless of the nature of the crime, they were felony convictions and therefore were appropriately considered in the habitual determination. The statute also specifically provides that the enhancement may be reduced by up to twenty-five (25) years if the prior felonies are sufficiently remote. The five year enhancement for the prior felony convictions is appropriate.

The conviction is affirmed.

GIVAN, C.J., and PIVARNIK, SHEPARD and DICKSON, JJ., concur.